[No. 3912.   Decided September 25, 1901.]

THE STATE OF WASHINGTON, *Respondent,* v. JOHN E. MAINES, *Appellant.*

APPEAL — CONFLICT BETWEEN AGREED STATEMENT OF FACTS AND ONE CERTIFIED BY JUDGE — WHICH RECORD REVIEWABLE.

Where the trial judge refuses to certify to a statement of facts stipulated by the parties to an appeal, but prepares and certifies a different statement of the facts, with his certificate attached that it is a true and correct statement of the matters and proceedings had at the trial, the supreme court can consider only the statement so certified, under Bal. Code, § 5060, which provides that "the judge shall certify that the matters and proceedings embodied in the bill or statement, as the case may be, are matters and proceedings occurring in the cause and that the same are thereby made a part of the record therein; and, when such is the fact, he shall further certify that the same contains all the material facts, matters and proceedings heretofore occurring in the cause and not already a part of the record therein, or (as the case may be) such as the parties have agreed to be all that are material therein."

LARCENY BY EMBEZZLEMENT — ELEMENTS OF CRIME — CONVERSION BY AGENT.

Where goods are intrusted by one to another for the purpose of sale on commission, the goods or the money therefrom to be accounted for daily, and the amount of commission deducted from the moneys received and paid over to the one selling the goods, the relation between the parties is that of principal and agent, instead of debtor and creditor, and where the party intrusted

with the goods sells same and fails to turn over the proceeds of the sale over and above his commissions he is guilty of larceny by embezzlement, under Bal. Code, §7119, which provides that "if any agent, clerk, officer, servant or person to whom any money or other property shall be entrusted, with or without hire, shall fraudulently convert to his own use, . . . or shall fail to account to the person so entrusting it to him, he shall be deemed guilty of larceny."

Appeal from Superior Court, Walla Walla County.— Hon. THOMAS H. BRENTS, Judge. Affirmed.

*John H. McDonald,* for appellant.

*Oscar Cain,* Prosecuting Attorney, for the State.

The opinion of the court was delivered by

HADLEY, J.—Appellant, having been charged with the crime of larceny, was tried, found guilty, and sentenced by the court to serve a term of two years and nine months imprisonment in the state penitentiary. There appears in the record what purports to be an agreed statement of facts signed by counsel for appellant and the prosecuting attorney, to which is attached a certificate of the trial judge containing the following:

"That the said annexed statement of facts contains what the parties hereto, by their respective counsel, have agreed by written stipulation annexed thereto to be all the material facts therein; that the same was presented to me for authentication on the 24th day of January, 1901; that I declined to certify the same as a part of the record in the cause for the reason that, as I remember the proceedings therein, the same is incorrect; that thereupon I prepared, certified and sent to the clerk for filing a true, full and correct statement of said proceedings according to my remembrance of them so far as material, which said statement was authenticated as hereto appended following this certificate."

Following the above is a stenographic transcript of a portion of the evidence taken at the trial and certain of the instructions given the jury, to which is attached the following certificate:

"I, Thomas H. Brents, judge of the above entitled court and the judge presiding at the trial of the above cause, do hereby certify that the annexed statement of facts contains a true and correct statement of the matters and proceedings had at the trial of said cause, and the same are hereby made a part of the record herein; that said statement contains all the material evidence in relation to the contract of employment between the defendant and the complaining witness Buford, and of the instructions of the court relating thereto that are necessary for a review by the higher court."

It is urged by appellant that the agreed statement is the only one properly before the court. It will be observed that the trial judge expressly says in the certificate first above mentioned, that he declined to certify said agreed statement as a part of the record in the cause. In the consideration of appellant's contention we are, therefore, confronted with this declaration of the court,—that the agreed statement is not a part of the record. Section 5060, Bal. Code, provides that,

"The judge shall certify that the matters and proceedings embodied in the bill or statement, as the case may be, are matters and proceedings occurring in the cause and that the same are thereby made a part of the record therein."

Manifestly, therefore, the trial judge must declare by his certificate that the statement is made a part of the record before this court can consider it as such. The same section of the statute above mentioned provides a remedy by mandate from this court when the judge refuses to settle or certify a statement of facts in a proper case. In the

event the judge should arbitrarily or without legal reason decline to make a proposed statement a part of the record, there is no resulting hardship, since an ample remedy exists. But until it has been made to appear to this court, upon proper application, that the trial judge has wrongfully declined to make a proposed statement a part of the record, we cannot consider that a part of the record which he expressly declares is not such. The second certificate above set forth expressly declares that the statement to which it is attached is made a part of the record herein, and we see no escape from the conclusion that the statement referred to therein is the one now before the court. Appellant's counsel insist that it appears from the record that it was the duty of the court to certify the stipulated statement of facts, and that this court should now treat the certificate that was made as sufficient to make it a part of the record. In support of this contention they invoke the further provision in the section of the statute above mentioned, which is as follows:

"And when such is the fact he shall further certify that the same contains all the material facts, matters and proceedings heretofore occurring in the cause and not already a part of the record therein, or (as the case may be) such thereof as the parties have agreed to be all that are material therein."

In *State ex rel. Hersner v. Arthur*, 7 Wash. 358 (35 Pac. 120), this court in its opinion seems to have construed the above statute as meaning that the trial judge shall certify an agreed statement of facts. In that case the precise question presented here was not involved, but in the discussion therein, and by way of emphasizing the logical conclusion of the argument there used, the court did interpret the portion of the statute invoked by counsel here as meaning that if the parties actually agree that the

statement contains the material facts, the judge shall so certify. In the opinion, at page 364, it is said:

"It is objected that this construction of the statute would place the settlement of a statement of facts in the hands of the litigants, or their attorneys, and that the effect might be to make this court a court of original jurisdiction. A glance at § 12 of the same act (Laws 1893, p. 116), leaves no doubt of the legislative intention to confer this power of settlement on the parties, for it specially provides that in case of the death of a judge the statement may be settled by stipulation of the parties with the same effect as if duly settled and certified by such judge while still in office; so that the only question remaining in my mind is the question of the constitutionality of the act, and I hardly think that the remote possibility of attorneys entering into a collusion, in violation of their oaths as officers of the court, to impose a false record upon this court is a sufficient consideration to warrant this court in holding the legislative act unconstitutional. If such a case should arise, and was brought to the attention of the court, I have no doubt of the power of the court to relieve itself of the attempted imposition."

The same interpretation is suggested near the close of the opinion in *State ex rel. Smith v. Parker*, 9 Wash. 653 (38 Pac. 156). In that case there was no written stipulation between the parties that the statement contained all the material facts, and the court said:

"The act does provide for a certificate, in certain cases, that the statement presented contains such of the material facts as the parties have agreed to be all that are material; but that would be a different case from this—one in which the written stipulation of the parties would be necessary. The judge in such a case will rely upon the successful party to protect himself by the terms of the stipulation against any surprise of the kind alluded to, and his certificate amounts to little more than an authentication of the signatures of the stipulators. But in the case before us

there is no element of a stipulation, or an agreement of any kind."

Whatever might be said upon this question if it were an original one, involving as it does the possibility of imposing a false or insufficient record upon the court, still this court has already construed the statute as above shown. We have reviewed this construction because of the extended discussion of the subject by counsel in their briefs, and because of the earnest and able discussion thereof by the learned trial judge in his written opinion, found with the files herein. But this case is now here upon appeal, and, as already stated, we must consider as a part of the record that only which the court below has regularly certified to be such. It is that certificate which gives vitality to the record and confers upon this court jurisdiction to consider it. If appellant was really aggrieved by the refusal to sign the agreed statement, he should have sought at the proper time and in the proper channel, by mandamus, to procure the certificate which would have made the agreed statement a part of the record.

Turning now to the merits of the case, we find that appellant was tried under § 7119, Bal. Code, which designates the crime therein defined as "larceny," and which is popularly called "larceny by embezzlement." The evidence shows that one Buford was the owner of a large number of rubber returning balls, which he was selling at different places, and he employed the appellant to sell these balls for him. Buford testified as follows:

"Q. What is your name? A. Talton Buford. Q. Where do you reside? A. My home is in Texas. Q. What is your business? A. For some time I have been in the business of selling rubber returning balls. Q. Do you know the defendant, John E. Maines? A. I do. Q. Has he ever been in your employ? A. Yes, sir. Q.

When? A. This fall. Q. What was he doing? A. He sold balls for me a week at The Dalles, a week at North Yakima, and during the fruit fair here in Walla Walla. Q. What was your arrangement or agreement with him in reference to the sale of these balls? A. The agreement at first was that he was to sell the balls at 10 cents apiece and I was to give him 20 per cent of the amount received for making the sales. On the last day of the fair here, the 6th day of October, the stock of balls had run down so low that I told him I could not pay so much, but that I would allow him 10 per cent., and if he did not sell enough to come to $8, I would make it that much to him any way, for his services for that day. Q. What interest was he to have in the balls or the money? A. None whatever. The balls were mine, and he was to sell for me under my supervision. They were to be mine until sold, and the proceeds were to be mine. At the end of each day we were to settle up. He was to account to me for the balls or their proceeds —the proceeds of what he had sold that day—and when the balls and the money were counted and checked up, he was allowed to take out his commission and I kept the balance. Sometimes I counted the balls and the money and handed him the amount of his commission, and sometimes he did the counting while I checked up, and he kept out his commission and handed me over the balance. Q. Were the counting and checking up to be done in presence of both of you. A. Certainly. I always charged him with the balls I gave him to sell and credited him with those returned and with the proceeds of those sold, and then, if they balanced, let him take out his per cent. on the amount of cash at the price fixed by me at which the balls were to be sold. Q. Was this according to your agreement and understanding? A. It was. Q. How many balls did you let him have to sell the evening of the 6th of this month? A. 856. Q. Where was that— in this city and county? A. Yes, sir. Q. Has he ever returned any of them to you, or accounted to you for them or their proceeds? A. He has not. Q. Do you know what became of them? A. He said he had sold them and was robbed

of the money in the alley back of Main street. Q. In this city? A. Yes, sir; that's what he said. Q. Now, to go back over some of your testimony, so the stenographer can get it. State again the contract and conditions under which Mr. Maines was working for you, upon the 6th of October. A. He was working, helping to close the balls out, what few were remaining, the balance I had on hand, at the rate of ten per cent. commission, or a guarantee of $8 for the two days' work. Q. If he sold anything less than 800, he was to get $8 anyway, and if he sold over 800—. A. At the rate of ten cents on the dollar.

### Cross Examination.

Q. Mr. Buford, how long had he been in your employ before that? A. He was in my employ about two weeks. Q. He had been selling those rubber balls? A. Yes. Q. What was your practice as to allowance. A. Twenty cents on the dollar, I had been allowing him. Q. You delivered him the balls, and he sold them? A. Yes. Q. After selling, he deducted his money, and gave you the balance? A. Yes. Q. Was he in the habit of coming to you every evening and settling up with you? A. Yes. Q. You delivered the balls to him on the evening of the 6th, and he sold how many? A. He sold 856 balls. Q. On that evening? A. Yes. He was to have ten per cent of the sales? A. Yes. Q. Prior to that time had he been in the habit of coming to your room and settling up with you every evening? A. Yes. Q. Keeping his commission and giving you the remainder? A. Yes. Q. And on the evening of the 6th of October you had delivered him 856 balls? A. 856 balls. Q. To be sold by him at that fair? A. Yes. Q. He to receive as his commission ten per cent? A. Yes. Q. This money that you complain of having lost was the result of those sales? A. Yes, sir."

It is assigned as error that the court overruled appellant's motion for dismissal on the ground that the facts did not constitute a crime. Appellant contends that under the

above facts he had in effect contracted to pay Buford nine cents for each ball he sold, with the privilege of returning to him those not sold and getting credit for them on his account, and that the parties therefore sustained to each other the relation of debtor and creditor. The case of *State v. Covert,* 14 Wash. 652 (45 Pac. 304), is cited as supporting this claim of appellant, but the facts there were wholly different from the case at bar. In that case the employer was the owner of a laundry and the accused was driver of a laundry wagon. No money or property of the employer was entrusted to the driver under the contract. It was a matter of indifference to the employer whether the driver collected any money or not. There was no fiduciary relationship between them. The driver simply brought in what goods he was pleased to bring, and he was directly charged as a debtor with the price of the work done thereon. The money owing from the customer was not the employer's money, but belonged to the driver under the contract. The employer did not confide in the driver as an agent to handle his goods or collect his money, and he was therefore a simple debtor. We think, however, that the testimony in this case, as above set forth, shows appellant to have been the agent of Buford; that he had no property interest in the balls, but was to account for them by returning them or the proceeds of their sale, when he was to receive his compensation based upon the number sold. The statute is as follows:

"If any agent, clerk, officer, servant, or person to whom any money or other property shall be entrusted, with or without hire, shall fraudulently convert to his own use, or shall take and secrete the same with intent fraudulently to convert the same to his own use, or shall fail to account to the person so entrusting it to him, he shall be deemed guilty of larceny, . . ."

Appellant was entrusted with the property as the agent of Buford, and the testimony is that he did not return the same or account therefor by producing money realized from their sale. We believe the statute was intended to reach such a case. It is immaterial whether, under the contract of agency, appellant deducted his commission and handed over the remainder to his principal, or received his commission from the principal after paying over the whole amount. The money belonged to the principal until there was an accounting, and, by consent of the principal, he was permitted to retain a given amount. In *Campbell v. State,* 35 Ohio St. 70, 75, it is said:

"It is also claimed that inasmuch as the defendant was entitled to a commission out of the funds collected as compensation for his services, he was a joint owner of the money, and was not therefore an agent within the meaning of the statute. This claim is not well founded. Although the defendant was entitled to a percentage of the moneys collected for his services, and might have taken and retained such percentage without being guilty of embezzlement, yet the entire sum, until such division was made, belonged to his employer, and he was a mere agent and custodian."

In *People v. Civille,* 44 Hun, 497, 502, the court says:

"In *State v. Kent* (22 Minn. 41), the defendant was a collector of pew rents, and it was held that, as he was entitled to commissions from the amounts collected, he was not guilty under the statute for misappropriating the entire money received as part of it was his own property. But there seems to be no good reason for this discrimination, for as to the residue of the money received over the commissions, the person receiving it has it in his possession, custody or control, as the agent, bailee or trustee of his employer, and that has been so considered in the English cases which have not relieved the accused because of the circumstance that he was entitled to retain his commissions out of the money collected by him."

In *People v. Hanaw,* 107 Mich. 337 (65 N. W. 231, 232), it is said:

"Again, it is urged that the draft came lawfully into the possession of the defendant; that he had a right to cash it, inasmuch as a portion  of the proceeds was his own; and that, inasmuch as this is true, embezzlement cannot be predicated upon the deposit of the draft. It is true that the defendant had a right to convert the draft into money, and take his commission, and pay the remainder to his principal, but this is not what he did. He converted into money or its equivalent, and did not pay his principal. He had no right to sell the draft with this unlawful design to misappropriate, and the law will not separate the act of sale from the intent to convert, but will say that with such an intent he had no right to sell the draft. The parties had a joint interest in this draft, and the statute is expressly aimed at the misappropriation of the principal's share in such cases."

In *Commonwealth v. Smith,* 129 Mass. 104, 109, the court says:

"He was an agent, authorized to receive money on account of his employers, and it is immaterial that his services were paid for, in whole or in part, by commissions or profits on such sales. Under the English statute against embezzlement by clerks or servants, it is held, in several cases, that the allowance of a portion of the profits on goods sold will not destroy the relation of master and servant. . . . The fact that the defendant received for the goods of his employers a check payable to his own order, did not vest in him the title to the check, or its avails. The relation of debtor and creditor did not exist, and the specific proceeds of the sales, whether in cash or in checks payable to their agent's order, belonged to his employers, and were held in trust for them, so long as the fund was capable of identification."

This court has also said that such a state of facts as exists here does not constitute such a joint ownership of

the money as will relieve appellant from the operation of the statute. *Brandenstein v. Way,* 17 Wash. 293 (49 Pac. 511).

The court, therefore, did not err in denying the motion to dismiss for want of sufficient evidence. The case was submitted to the jury under instructions which were as favorable to appellant as he could have asked under the law. The jury heard the evidence, and found the appellant guilty. The court did not err in refusing to grant the motion for a new trial, and, since we find no error in the conduct of the trial, the judgment is affirmed.

REAVIS, C. J., and FULLERTON, DUNBAR, ANDERS and MOUNT, JJ. concur.